MERRIMAC MATTRESS MFG. CO. v. FELDMAN.

(Circuit Court, D. Massachusetts. November 3, 1904.)

No. 1,744.

1. PATENTS—ANTICIPATION—CRUDENESS OF ANTICIPATING STRUCTURE.
The fact that a mechanical structure is crude does not prevent it from being an anticipation of one subsequently patented, where the inventive thought embodied is the same in both.

2. SAME—ABANDONMENT.
Where an unpatented mechanical invention was reduced to practice by the construction and use of the device, and its exhibition by the inventor to others, it cannot be abandoned so as to change its effect as an anticipation of a device subsequently patented by another.

3. SAME.
Anticipation is not avoided by the fact that the inventor of the anticipatory device, which he reduced to practice, did not realize its value, and so changed it before applying for a patent that the patented structure was not an anticipation.

4. SAME—PRIORITY OF INVENTION—REDUCTION TO PRACTICE.
The first to reduce an invention to practice, as shown by an actual construction produced in court, is usually held to be the inventor, as against another who merely says he had previously conceived the invention.

5. SAME—ANTICIPATION—COUCH-BED.
The Leighton patent, No. 667,916, for an interconvertible couch-bed, is void for anticipation by one Mallet, who conceived the invention and reduced it to practice by the construction of a couch-bed prior to its reduction to practice by the patentee.

In Equity. Suit for infringement of letters patent No. 667,916, for a couch-bed, granted to Eugene R. Leighton February 12, 1901. On final hearing.

Milton E. Robinson and James E. Young, for complainant.
Roberts & Mitchell, for defendant.

HALE, District Judge. This suit is for infringement of claims 5, 6, 7, and 8 of letters patent of the United States, No. 667,916, issued February 12, 1901, to the complainant, on the invention of Eugene R. Leighton, for a new and useful improvement in couch-beds. The same claims of the patent have already been before this court in Merrimac Mattress Manufacturing Company v. Brown, 122 Fed. 87. In that case there was no argument by the defendant, but the court made a full examination of the matter brought before it in the record, and decided, upon a careful examination of the specification and claims, that there was sufficient in them to constitute invention. Anticipation was the leading defense upon which testimony was offered, but the testimony on this point was vague and unsatisfactory, and was not persuasive to the court. The claims now at issue are as follows:

"(5) An interconvertible couch-bed, comprising two complete interlocking laterally sliding sections, each having all of its parts, including the mattress support, permanently connected, the sections being relatively constructed, and arranged to permit their separation into two independent beds without dismantling either of them.

¶ 4. See Patents, vol. 38, Cent. Dig. § 72.

"(6) An interconvertible couch-bed, comprising two complete, interlocking sections, adapted to be nested one within the other, each section having side-bars, end-bars and legs, all permanently connected together, and each section being separable from the other into an independent bed.

"(7) An interconvertible couch-bed, comprising two complete, independent metallic beds, adapted to be arranged in interlocking relation with the legs of one bed between the side-bars of the other bed, and the end-bars of the first-mentioned bed above the side-bars of the second-mentioned bed, all without disconnecting any of the parts of either of said beds.

"(8) An interconvertible couch-bed, comprising two complete, independent beds, each having side-bars, legs, end-bars and a mattress stretched between said end-bars, all of said parts being permanently connected together, said beds being adapted to be arranged in telescoping interlocking relation, with the legs and the end-bars of one bed located respectively between the side-bars and the side-bar and the mattress of the other bed, whereby one bed may be moved laterally a limited distance relatively to the other bed, or may be completely separated therefrom, without dismantling any of the parts of either."

The object of the invention is shown by the specification to be:

"To provide an article which can be converted from a bed to a couch, and vice versa, without the employment of operating mechanism, or other power-transmitting devices, whereby said article may be greatly simplified in construction."

The inventor further describes his invention as follows:

"Referring to the drawings, it will be seen that the couch-beds are constructed in two sections, one of which telescopes within the other, and I shall refer to them as the 'main section,' and the 'sliding section,' respectively. * * * As thus far described, the main frame is capable of use by itself without the addition of the sliding frame. The sliding frame is also capable of use by itself, and it may be disconnected from the main frame. * * * By tilting the inner sides of the two sections, the sections may be separated without dismantling either of them; being each a complete bed without further additions. This is a new feature with me, for, as far as I am aware, I am the first to have provided an interconvertible couch-bed comprising two interlocking nesting sections, which may be separated without dismantling either of them; and each of which, when separated, forms an independent bed. * * * From this description, it will be seen that the article described may be converted from a bed to a couch, and vice versa, by simply moving the sliding section laterally; and, as each section is supported independently of the other, little or no effort is required to move the sliding section upon its own casters. One of the wire mattresses is on a plane a little below the other, but the hair or cotton mattress which is placed upon them may be thicker upon one side than the other, to compensate for the difference in height of the two spring mattresses."

This case came on for final hearing before the court some months ago, and was reopened in order to introduce newly-discovered evidence relating to anticipation. That evidence is now before us. The defendant urges that one Adrian De Piniec-Mallet was the prior inventor, and that this priority is fatal to the patent. It is necessary for the court to consider this proposition in its aspect of fact and of law. Leighton reduced his invention to practice early in the fall of 1899, and afterwards embodied that invention in the patent in suit. It is claimed that Mallet reduced his invention to practice in October, 1898; but it is insisted by the complainant that the construction made by Mallet in 1898 was not identical with the invention of Leighton, that it was never in fact reduced to practice, and that the facts relating to it were not such as to make it available to the complainant against the patent

133 F.—5

founded upon the Leighton invention. This renders it necessary to examine with care the evidence upon the subject. The testimony tends to show that Mallet and his wife kept a boarding house in the summer time at Bensonhurst, Long Island. Mallet testifies that in the spring of 1893 he conceived the entire invention involved in this patent. He says he found that if two mattresses or mattress frames of the ordinary wire fabric construction, one a little shorter and lower than the other, were placed alongside each other, the shorter could be inserted or nested in the larger, so that its wire fabric might slide between the wire fabric and the side rail of the larger. He produces sketches which he says he made in 1893 of the construction in question. The testimony tends to show that he disclosed his invention to certain persons in 1894 and 1895, and that in 1895 he made a model which he produces in court. This appears to be the model of an interconvertible couch-bed, comprising two complete, interlocking, laterally sliding sections. In October, 1898, Mallet took some of the cot frames which he had in his boarding house into his yard, and made an embodiment of his invention, which he has produced, and which we have now before us. This construction consists of a short cot, which is made to slide, legs and all, in between the mattress and side rail of a larger cot. The construction appears to be substantially an interconvertible couch-bed, comprising two "complete, interlocking, laterally sliding sections." After making this construction, Mallet testifies that he slept upon it as a single bed, and also tried it as a double bed. Frederick Tworger, a grocer, testifies that he saw Mallet complete the bed in his back yard in 1898; and he recognizes the exhibit, which is produced in court, as the one which he then saw. He says that he himself, in October, 1898, was shown by Mallet how the bed worked, and that he pulled it out, and closed it up, and tried the bed himself. He says substantially that Mallet admitted that the structure was crude, but, "if it was made out of metal, it would fit more closely." Louis Baer testifies that in the fall of 1898 he saw in Mallet's house the extensible couch-bed; that Mallet explained it to him, and told him how it worked; and that he had previously seen the model of the bed. Mrs. Marie Mitchell testifies that she visited the Mallets in the spring of 1899, just before Easter, and saw the bed as now in evidence; that Mallet explained to her the bed and its operation, and that she and her little girl slept upon it on the night of her visit to the Mallets in the spring of 1899, the little girl using the shorter of the two beds; that the beds were extended as a double bed. A housemaid named Nielson, who worked for Mallet in the spring of 1899, testifies that during that time she slept in the Mallet house on a part of the double cot bed which is now produced in court, and that another housemaid slept in the same room on the other section of the same bed. Isidor Goldsmith, a butcher, testifies that in the summer of 1899 he saw Mallet's couch-bed. He describes how Mallet showed him the combination of the two sections of the bed. Mrs. Mallet, the wife, testifies as to the construction by Mallet of the bed produced in court, and that it is now unchanged from its condition when it was made in 1898, except that it shows some age and marks from wear and tear. She corroborates Mallet in respect to the instance of Mrs. Mitchell and her daughter sleeping on the bed

in the spring of 1899, and as to its use as two single beds by the house-maids. She says that Mallet himself slept on the larger section for several weeks at one time, and she corroborates her husband, also, in reference to the making of certain of the sketches and the model. Other corroborative testimony is offered. Some of the evidence with regard to Mallet's mental processes from 1893 to 1895 relating to this invention, as indicated by his sketches and model, appears to us rather vague and unsatisfactory. But the court is satisfied from the evidence that Mallet made in the fall of 1898 the bed which is now before us, and which is substantially, although rudely constructed, an intercon-vertible couch-bed, comprising two complete, interlocking, laterally sliding sections. We are satisfied from the testimony that Mallet in October, 1898, reduced to practice his alleged invention, and that it is, in substance, the invention afterwards embodied in the Leighton patent in suit.

In the Brown Case we cited the Barbed Wire Case, 143 U. S. 275, 12 Sup. Ct. 443, 36 L. Ed. 154, and Coffin v. Ogden, 18 Wall. 120, 21 L. Ed. 821, and held, in pursuance of those authorities, that the burden of proof rests upon the party setting up an unpatented article as proving prior use, and that every reasonable doubt should be resolved against the party setting up such unpatented article. In the Brown Case the evidence of anticipation was from the recollection of witnesses about events of many years before, unaccompanied by the production in court of any distinctly anticipatory device. All the evidence was vague and unconvincing, and failed to persuade the court beyond a doubt. To the evidence in that case no more distinct antithesis can well be conceived than that presented in the case at bar. The bed constructed by Mallet is now before us, and the evidence satisfies us, beyond a rea-sonable doubt, that it is a reduction to practice of Mallet's invention. We think it brings the case distinctly within the rule in Coffin v. Ogden, to which we have referred. It is true that the construction made by Mallet in 1898 was crude, and very far from presenting mechanical perfection; but mechanical perfection is not necessary for a complete presentation and illustration of the thought of the inventor. In Daniel v. Restein & Co. (C. C.) 131 Fed. 472—a case recently decided—Judge Archbald considers carefully a device anticipatory to the inven-tion of the patent then before him. He says:

"It is contended, however, that the two packings are distinguished by the results, the one being highly efficient, and the other not at all so; * * * but, as already intimated, the difference so established is one of degree, and not of mechanical structure, which alone is patentable."

On the question of what evidence courts have held sufficient to estab-lish public use, he says:

"Prior knowledge and use by a single person has been held to be sufficient to negative novelty. * * * It was not necessary that it should go into general use, or become a commercial factor, as suggested. * * * I see no way for escaping the conclusion that it clearly anticipated that which is covered by the patent in suit, which it therefore deprives of its novelty."

In this matter we derive much instruction from Coffin v. Ogden, to which we have referred in the Brown Case, which is cited in the case to which we have just referred, and is the leading authority on this sub-

ject. That case presents strong similarity to the facts in the case at bar. The patent there before the court was granted to one Kirkham. The question presented to the court was whether the Kirkham patent had been anticipated. Kirkham made his invention in March, 1861. One Erbe in 1860 had made a lock, an exhibit of which was brought into court. He had made three such locks before he made the exhibit lock. A witness, who had been a locksmith more than eight years, testified that he went to Erbe's house, and was shown by Erbe one of the locks, and was told by him how the lock was used. He identified the exhibit lock as identical with the lock shown him by Erbe. Two other witnesses testified that Erbe had shown them a lock like the exhibit lock. There was no proof that Erbe had ever made any locks containing the invention in question, except those referred to in the testimony. The evidence disclosed that he had applied for a patent, and had failed to get it. Mr. Justice Swayne, in speaking for the Supreme Court, said:

"Here it is abundantly proved that the lock originally made by Erbe was complete and capable of working. The priority of Erbe's invention is clearly shown. It was known at the time to at least five persons, including Jones, and probably to many others in the shop where Erbe worked; and the lock was put in use, being applied to a door, as proved by Brossi. It was thus tested and shown to be successful. These facts bring the case made by the appellees within the severest legal tests which can be applied to them. The defense relied upon is fully made out."

The court held a device anticipatory, and that it had been reduced to practice, even though the inventor of that device had applied for a patent for it, and had been refused. In the case at bar, it appears that Mallet, after making his couch-beds in 1899, went to a patent solicitor with the model which appeared to him to be more complete in form than any other he had worked out, and that through his solicitor he obtained a patent substantially for arranging two wire mattresses in sliding relation; one wire fabric lying between the wire fabric and side rails of the other wire mattress frame. Mallet may have thought that the elaboration of his design which he brought to his solicitor presented an improvement upon the device which he had conceived for an interconvertible couch-bed, and which he had constructed in 1898. The bed which he patented had a headboard and footboard, and all the appurtenances which go to make up a bed structure. He shows, however, that he then had in mind his 1898 construction, by illustrating it in the mattress frames connected with his patented device. Those mattress frames were removable from the bed frames, which constituted merely supports for the mattress frames. The mattress frames could readily be laid upon the floor and used as an interconvertible couch-bed; the relation between the two being such that the side rail of the smaller mattress frame was inserted between the side rail of the larger mattress frame and its wire fabric, and then the wire of the smaller frame could slide under that of the larger frame. It is unnecessary to inquire whether Mallet was misled by his own idea that elaboration constituted improvement, or whether he was misled by a mistake of his solicitors in not clearly seeing the difference between simplicity of invention and that elaboration which sometimes dissolves simplicity. The court is not convinced by his testimony in regard to the procuring

of his patent, or by the further testimony offered by the complainant upon the same point, that the action of Mallet resulted in the abandonment of his invention. We are satisfied that Mallet reduced the invention to practice in 1898. After he had so reduced it to practice he could not abandon his invention, for he had already given it to the public. Giving the most unfavorable construction to Mallet's action in obtaining his patent, such action would show that he did not give himself full credit for the invention that he had made; that he did not realize its simplicity and scope, nor its possibilities. But it is for us to inquire, what did he really invent? and not, what did he think of the invention which he had made? In Ideal Stopper Co. v. Crown Cork & Seal Co. (C. C. A.) 131 Fed. 246, Judge Brawley says:

"We do not mean that Young's invention is necessarily limited to his own conception of its possibilities. Columbus would not be the less entitled to be considered to have discovered America, because when he set out on his voyage his object was not to discover a new continent, but a new route to an old one."

Mallet's construction in 1898 clearly showed identity of the inventive idea with the invention afterwards patented by Leighton. The evidence convinces us that he reduced that inventive idea to practice. The fact that after he had reduced it to practice he did not put it into the form of a patent, but did patent something else, cannot be held to have defeated his inventive idea, or to have effected the result of abandonment of that idea. In coming to this conclusion on the question of abandonment, we intend to give full force to the fact that Mallet's conduct in obtaining his patent, as well as his further conduct as shown by the testimony of the complainant, has probative value against him on the question of whether he really made the invention in 1898 which he claims that he made; but the fact of his making that invention is so clearly shown to us by the other testimony which we have already commented upon that we must decide in favor of his having made that invention, although there is testimony which is properly before us, and which is opposed to this conclusion.

We have no doubt that Leighton reduced the substantial invention of the patent in suit to practice early in the fall of 1899, soon after he removed into his Green street house. This was one year later than the construction by Mallet of his couch-beds, which we have held to be a reduction to practice of an invention identical in inventive thought to that of Leighton. But the complainant insists that the inventive thought of Leighton, which was developed into his invention, was as early as 1892, and before any inventive idea is claimed to have been in the mind of Mallet. The complainant claims further that Leighton reduced his invention to practice as early as 1895. In considering the Mallet invention, we have already proceeded without regard to the testimony relating to his previous inventive thought as far back as 1893, which culminated in the reduction to practice in 1898. It is difficult to follow the course of the human mind, unless the avenue is made clear by some actual act of the inventor, which may be brought clearly before the court, not only by testimony, but by an actual construction produced in court; and so it is usual in courts that the first who reduces to practice, not the first who says that he has conceived an invention, is the one who is held to be regarded as the inventor.

In this case there is considerable evidence of a previous inventive idea on the part of Leighton, even as early as 1892, and some evidence that there was a reduction to practice as early as 1895; but this testimony is not corroborated by actual constructions brought before us, and is not otherwise sustained in such a manner as to make it convincing to the court. The burden which rested upon the defendant in the first instance to show that Mallet's invention was made at an earlier date than that of the Leighton patent in suit is now transferred to the complainant, who, in order to prevail, must prove that the anticipation has been anticipated. In our opinion, no such proof has been furnished by the complainant. We, therefore, in the case of both Mallet and Leighton, place the time of the invention at the time of the actual reduction to practice. The result of this is that we are compelled to hold that Mallet made an invention identical in inventive thought to that of Leighton, and that he made this invention in the fall of 1898, about a year prior to the time of the actual invention by Leighton, which was embodied in the patent in suit. In this view of the case, it is unnecessary for us to examine further the testimony in regard to other anticipatory devices which have been brought before us, both in the patented and the unpatented art. It is unnecessary, too, to pass upon the other questions which have been raised by counsel, both orally and in their very able and exhaustive briefs. It is sufficient for the decision of the cause to say that, in our opinion, the invention of Leighton, embodied in the patent in suit, has been anticipated by Adrian De Piniec-Mallet.

The decree must be: Bill is dismissed, with costs.